tation on the other side. Consolidated with the second petition. So I appreciate you making time to do this by Zoom. I hope it's convenient for everyone and it's useful for us. So who goes first? I don't have my cheat sheet in front of me. Good afternoon, Your Honor. I'm Shai Dvoretsky with Skadden on behalf of Airlines for America and the other petitioners in 2460231. I'll go first, and we've divided up the time. Twenty minutes for me, of which I'm reserving four for rebuttal and ten for the Council for Spirit and Frontier. Thanks for that explanation. May it please the Court. The Court should vacate the Department of Transportation's Ancillary Fee Disclosure Rule. DOT's rule prescribes a code of fair competition for the airlines, but Congress never gave DOT that sweeping authority. To the contrary, Congress deregulated the airline industry to open the skies through free market competition. On top of that, the rule was a solution in search of a problem. The result is that DOT didn't and cannot explain it, and so it violates the Administrative Procedure Act twice over, both because DOT failed to engage in reasoned decision-making and because DOT relied on data it never gave the public a chance to comment on. Starting with the statutory authority argument, DOT's rule exceeds its statutory authority for two reasons. First, because Section 41712 authorizes DOT only to stop, not to prescribe, airline practices. And second, because the airline's existing fee disclosure practices are not unfair or deceptive. What does your argument... Do you want to talk to somebody? Okay, go ahead. Go ahead. Aren't there several provisions under Title 49 that expressly contemplate the rulemaking of DOT? And I'm thinking specifically of, for instance, Section 40113A, which authorizes the Secretary to prescribe regulations that he considers necessary to carry out Section 41712. Yes, Judge Douglas, and I think the key part of that language is that the regulations are to out Section 41712. So, 41712 describes the scope of the department's substantive authority. The authority to... I'm sorry? Hey, call from one of the other judges. Oh, okay. The authority to carry out other provisions is not authority to nullify or to change the scope of those provisions. Again, the provision that's being carried out here is 41712. It's that provision that limits the scope of DOT's authority. And under 41712, Congress authorized DOT to order an air carrier to stop a practice. The key language there, the key limitation in the statute is that DOT may order the airline to stop the practice. Stop means to stop a particular practice, not to prescribe an alternative practice. If what Congress had wanted here was to allow DOT to write a rulebook for airline's pricing practices, it could have written a different statute. We know that because Congress has written that type of statute in other areas. For example, Congress authorized the FTC to, quote, prescribe rules which define with specificity acts or practices which are unfair or deceptive. It did the same thing with the CFPB. But Congress chose not to give DOT that same authority in 41712. Yeah, also, what does your argument do to the disclosure requirements that have existed for decades, requirement of showing complete final price? Are those basically grandfathered in under your argument? Those are the same argument. Wouldn't they also be beyond the authority? Well, I don't think that anything is grandfathered in on an adverse possession sort of theory. Try not to go there, but does a new argument cause those to fail as well? I think it might cause some of the existing rules to fail. It does call them into question. One good example of a rule that I think would be called into question is the 24-hour reservation hold policy. That's mandating a particular practice that Congress left to the airlines to compete over when it deregulated the industry. But at the beginning of, I mean, you know the regulation far better than I do, but at the beginning of the regulation, set of 39984 says, department considers any advertising solicitation by a variety of entities to be unfair and deceptive unless, and then off it goes. So, it's using the same authority that was used here, and it seems to me would fail or rise depending on what we do in this case, though they're not subject to attack, and so we wouldn't actually deal with them. But I'm just talking about the argument. Depending, if DOT's rule actually prescribes particular disclosures, that might very well be subject to the same argument that this is a prescriptive rather than a prohibitory rule. But of course, Congress can act to codify a rule or to confer authority to DOT if it wants to. It's done that before. It did that just a few months ago when DOT promulgated a rule about refunds. Congress in the FAA Reauthorization Act codified that rule. So, when Congress wants to give, when Congress wants to prescribe rules for airlines, it knows how to do that, and it had also done that in pre-1978. Congress in 1978 eliminated the power of the agency that it had before to prescribe airline practices. It kept in place only the prohibitory power. That's why Congress in 41-7-12 wrote a statute that emphasizes adjudication, that requires DOT to hold a hearing, to identify a particular practice, to investigate the practice, and to confirm that it's unfair or deceptive before it can order it to stop the practice under 41-7-12. Okay, let me ask you about the stop, because to me it seems like telling y'all to stop basically lying needs to explain what it is you do need to do. If you all, you know, if you all are not letting people know that they bring a suitcase and it's going to be charged a bunch of money, then that's something that y'all need to do. And so, stopping the lying needs to be starting the truth. And what is it that they can't not, that they can say if they're trying to stop what they think is happening? Judge Haynes, DOT did not find here, and it couldn't find here, that airlines are failing to disclose ancillary fees. There is no question that airlines do disclose those fees. That's undisputed in this case. What DOT has prescribed is a code of competition that comprehensively regulates every aspect of how the airlines disclose those fees. But aren't there a lot of people who don't know it? I mean, I fly a lot, so I'm well aware that, you know, if I'm going to bring a suitcase, I might get charged for it and that kind of thing. But these people that just go and go, and I really think on the third-party thing, where they go on Google, for example, and they're saying, oh, I want to go to New Orleans next Monday, then they give you a ton of different possible airlines. And it would take forever to even kind of see an illegal coroner that you'd have to click on to find out about that. Doesn't it need to be more upfront? Um, so DOT did not find here that consumers in any large measure are confused about whether their ancillary fees are being charged. Reasonable consumers know that ancillary fees are charged separately from the base fare. Some consumers choose to purchase those ancillary services. Some choose not to. But reasonable consumers know about that these days. Um, and again, DOT did not find here, this is not simply a rule requiring disclosure where airlines are failing to disclose a particular item of information. It's undisputed that airlines are disclosing it. DOT wants to regulate and prescribe every aspect of the manner in which they are disclosed, including where they're disclosed on the first screen, um, what specifically is disclosed, even verbatim language about seat selection. That's not... So let me ask you about what's not disputed, uh, and fleshing out just a bit what you said. One of the arguments, one of the statements in the regulation, and in the briefing probably, is about dripping prices, that you keep working through the system, through the, whatever's online, you finally get to the final price, but you're somewhat locked in before you get the final price. Is it, um, including the fees that we're talking about, is it conceded that ultimately before the ticket is purchased, all the, um, relevant pricing has been disclosed, and the concern is how, when it, when it appears on the screen? Yes, there's no, there's no question that by the time you go to book the flight, uh, a consumer has had access to the information about what the ancillary fees are going to be. Air carriers are not engaged in drip pricing. This is not a situation where... What do you mean by drip pricing? What I want to make sure you're talking about what I thought that meant, which is you keep getting a new expense as you work through the, uh, whatever you're doing online. Is that what drip pricing is? Uh, so my understanding of drip pricing, to use a real world example, would be like if you go to buy a ticket to a concert, and you're told up front that it's $100, but there's actually no way that you can buy that concert ticket without also paying $50 in service fees, and those aren't disclosed until later. That's not what's happening here. Air carriers are advertising the whole price of the product. An individual can book and travel on the ticket with the price listed, which already includes taxes and fees up front. Now, if you choose to buy additional services, whether that is a preferred seat or extra baggage carry-on or whatever that is, there are extra charges for that. That's the same as going to a restaurant and saying, this is your main course. Do you want fries with that? Do you want a drink with that? Those are additional services. It's not drip pricing to not present those on the very first screen. We'll make sure what you just said in the last 15 seconds, how that fits with what you said earlier. Still, the french fries and whatever else, your extra charges, are applicable to airline fares. There's no argument that the consumer doesn't know about the french fry prices to merge back into airline tickets before buying the ticket. Correct. Is there any argument that some of this comes up after you have already put in your visa or whatever and purchased? No. Airlines disclose. They often disclose it already on the first screen simply using hyperlinks, but DOT has prohibited that already because, again, they're trying to prescribe a particular code of disclosure that is their optimal regime. What if they say stop hyperlink? They would have to rule out a hyperlink as an unfair or deceptive practice, which they haven't done here. There's a standard that DOT has adopted for what constitutes an unfair or deceptive practice. DOT here has not gone through that process. That goes to what is our second statutory argument, which is that the practices at issue here, the airline's current practices, are not unfair or deceptive, and that's a legal question for the court. A practice is unfair if it's likely to cause substantial injury to consumers that's not reasonably avoidable and that's not outweighed by countervailing benefits. I'm kind of actually wondering about this because I think I'm not going to pretend I've been on every single airplane's website, but when you go on an airplane website, that is a different animal than going on a Google website, but the Google and those people, that group, the third parties, are not here. They didn't challenge this, and yet those are the ones that are likely to have the long walk before you finally find out, oops, if I bring a bag, it's going to cost me, more so than I think than the airlines, although, again, I'm not going to pretend to know every airline and what they say, so why are y'all here and not them? Well, the rule directly regulates our websites and our apps. As we showed at the stay stage, there'll be tremendous costs involved in redesigning websites and apps to comply with this rule. The redesigns would ultimately harm consumers by cluttering the interface. Imagine on an iPhone going to book a flight and having all of this extraneous information forced to appear there about ancillary fees that many consumers aren't even interested in because they're not going to check a bag. They just want the base fare. What is your best evidence that the cluttering of the screen is going to harm consumers? DOT itself recognized that there is a cost in terms of clutter to adding this additional information, and so that comes straight out of DOT's own study. Now, DOT didn't engage in reasoned decision-making, which is another argument that this rule should be set aside, because it took action without adequately substantiating the need for and benefits of the rule, and so DOT itself explained that their information overload is a real problem. Counsel, is there any effort by DOT, you should say, I should ask the other counsel, to dry run this? Was there any test of what how this would work and how cluttered it would be and how whatever else your negatives are? Certainly not a dry run in terms of anything that the airlines were required to do. In other words, we've been engaged in our existing practices, which DOT has now outlawed. It wouldn't be the general population, I guess, but I mean I hear you and I see the screenshots, or maybe they're not screenshots, but the representations of what this would look like, and it's concerning that this really may be, you say it's a cure for which there's no disease. I think this may be a cure that's worse than a disease, but how do we get a handle on that as a court? And you say it's on the issue of arbitrary and capricious. There's nothing unfair because on balance they're equally or better off under the system. How do we get a handle on this part of your argument if we don't see a problem in the authority of DOT to be issuing regulations in the first place? So I think first there is still a statutory authority problem because it's the court's role to determine whether the practices that the airlines are currently engaged in are unfair or deceptive. That follows from the ATF had exceeded its statutory authority in regulating bump stocks because bump stocks didn't fit within the statutory term machine guns. That was a question that the court determined rather than deferring to any supposed expertise by ATF about how machine guns operate. Here the question of whether some practice is unfair or deceptive is likewise a question for the court. There's a judicially administrable legal standard for that. Again, any supposed injury from having to click on a hyperlink in order to get to an ancillary fee information is not substantial. Any supposed injury is also readily avoidable, again, because you can click on a hyperlink. And any supposed injury is outweighed by the benefits of clear, easily navigable search results that the rule here destroys. And DOT itself has admitted, this is 18 of the 2024 RIA, in the case of disclosures, more information isn't always better. And so for that, that's simply a legal determination for the court to make that DOT hasn't established that the practices here are unfair or deceptive. You're time's up. You saved a little time. If any of my colleagues have any more questions, you'll just have to pause and we'll hear from you again. All right. Thank you. Good afternoon, Your Honors, and may it please the court. Donald Kroll for Petitioner Spirit Airlines and Frontier Airlines. And I've reserved two minutes for rebuttal. Since 19- So let me ask you, did I read correctly? Is it Spirit Airlines that is at least taking initial steps for bankruptcy? Yes, Your Honor, they did- How does that affect the role in this case, if at all? Well, it certainly goes to the impact of the regulation, as we've put forth in our briefs and in the emergency motion. These rules are expensive and they take time. They take, you know, for Spirit, $50 to $100 million just to implement the rule, the technology costs of implementing the rule. Why? Why is it so expensive to change this thing online? I don't understand that. Well, Judge Haynes, a lot of it goes to the way that the prices are communicated with the ticket agents. It takes a lot of technology to get dynamic pricing, which is what a lot of the airlines use to some extent, and Spirit, Frontier, and other low-cost carriers use to a larger extent for ancillary fees. So for a static fee, you know, it's kind of like having a sheet of paper that you put up, bags are $50. That never changes no matter what route you're on. For dynamic fees, it's, you know, there's a phone call essentially over the internet that takes place from the ticket agent to Spirit, and it says, who is this person? What is their loyalty member status? Are they military? You know, what is this market? What is the price during this time of day and this time of year? And all that needs to be transmitted within milliseconds. And also, picking up on that, the amicus from Airline Tariff Publishing sets out a parade of horribles of how hard it would be to make this work on an individualized basis. But I see that more applicable for Expedia or whatever else would be relevant along those lines, and not for Spirit or any individual carrier. I'm sure you're familiar with that brief. Aren't those arguments really more, not directly applicable or not really very convincing when it comes to the problems for an individual airline, figuring out who an individual member of its customer base is or is not a member, and all the parameters that would go into discounts or no discounts? Isn't it, aren't the problems much less for an individual airline dealing with its single customer? Well, Your Honor, a big portion of at least advertising, getting the customer even to the airline's website, if not sales, happens through these third parties. And so the airline itself decides who it chooses to provide its information on fares and on ancillary fees too. But that can be hundreds of millions of searches and hits a day where someone goes on Expedia or Travelocity, and then they find the fare they want, they're to redirect it to Spirit's website. So it's a big component of the airfare's customer base. I'm not making any distinction between the authority of DOT or the reasonableness of what DOT does, either one. Between the price of the ticket and these ancillary fees, getting back in part to my question to your colleague, counsel, that it doesn't seem, it does seem that the ramifications of this argument would undermine an awful lot of what seems well settled about what airlines have to do to disclose their lease prices for their tickets. Well, Your Honor, our primary argument, which is that the department has some authority, but only in foreign air transportation, is a narrow one, and it wouldn't cut against other rules. The department has never used Section 41712 in this way to regulate how, when, where, and what pricing must be advertised. Well, that's a bit broad a statement, seems to me, when DOT or predecessor perhaps has said that you have to show the total price, taxes plus the airfare. I'm getting feedback. Okay. It seems like that DOT has gone pretty far down this road already, insisting that certain things be disclosed, and I'm just trying to see what's different about these fees. Yes, Your Honor, the department has before regulated the price that is shown to after they've chosen their products that they're going to pay for. That's what I think the rule you're referring to, the 2011 full fare rule, when a customer has chosen what services they're going to use, when the airlines advertise that product, the price you show the customer has to be shown in a certain way, and it's the price that they ultimately pay. And that's being required by regulation? Correct, but DOT has never required an airline to advertise a product, which is what they're doing here, because on Spirit, on any airline, as my co-counsel mentioned, you can just purchase the ticket. That is all you need, or you might take a carry-on bag, or it varies by person to person, but that is the flexibility that the Airline Deregulation Act was putting into place, and in particular, to support small carriers like Spirit and Frontier who thrive on this innovation. This is how the smaller carriers compete with the larger carriers. Dynamic pricing, they offer better prices on certain markets they can compete against better. They offer the base fare, in particular, as low as $20, $30. It seems to me the argument for Spirit and other ultra-low cost carriers is that this is even worse on you than it would be for a major carrier with not such... I don't know if that's where the line is between dynamic pricing and wimpy pricing, but is it a more difficult and expensive matter for a low-cost airline whose pricing schema is maybe a little more complex? Yes, Your Honor, and that goes both to just the way the airlines are structured. A larger carrier has its own internal information technology team. It's got a bigger budget, and carriers like Spirit and Frontier, they rely on outside vendors, and they compete on these other dynamic pricing of ancillary fees where the larger carriers may cross-subsidize internally through different products that they offer that the smaller airlines don't because they're primarily competing on price. So, when DOT has implemented a regulation that costs $50 to $100 million for one airline, that is a substantially big difference from Spirit and their total revenue per year versus the Frontier. I'm just wondering, is there anything that if you all had more time, if we ended up agreeing that DOT had not fully given you all an opportunity to speak, and we sent it back for you all to speak with them, do you think you all would agree on something that would stop but would not cause you all a lot of problems but would ultimately help the world or at least the U.S. of people trying to fly? I mean, I'm just trying to figure out because there seems to be things that you all sort of agree on, but you don't say so, but that maybe you all could talk about. Is that a possibility? Well, yes, Judge Haynes, and I think the best example is the department here is requiring advertising of the price. They're not requiring a disclaimer that says you may have to pay for bag fees. Airlines already do that, and it's very clear to the consumer when you go on a website and look for a fare that you see different options and what they include. That's a reasonable regulation I think we could agree on, but that's not what DOT did here. And if I could just answer one quick question about, you asked my co-counsel, Google and others are not here in part because they're specifically exempt from the regulation. They're called meta-search entities and the department decided not to include them as part of this regulation. All right, counsel. Thank you. We'll hear from the appellate staff of the civil division of the Department of Justice. Thank you, your honor. Martin Totaro on behalf of the U.S. Department of Transportation. The department promulgated a modest but important rule to ensure that consumers know up front the fees that carriers charge for transporting checked and carry-on bags and for canceling or changing a reservation. The rule requires airlines and ticket agents to clearly and conspicuously disclose fees for those services when a fare and a schedule is provided in an And if I could just jump into the issue that Judge Southwood raised. I'm sorry though, can you tell me is it true that the only people that are affected by this are the people we have before us plus a couple more airlines like Southwest? I know, your honor. Ticket agents and of course consumers and I do think it's ironic that Google is not affected is what you're saying. The meta searches are carved off, but ticket agents certainly are covered by the rule as our consumers and yet none of them had any issue with the rule and are not here today after filing a petition for review. And if I could also go to the scope. I'm sorry, that world where if I'm just I'm not trying to fly on xyz air, I'm trying to just get from here to New Orleans and whatever would be the cheapest flight. So I go online to those entities. I realize it's not just Google, but an entity like that where it would show me the cheapest because it would give me the list of everybody that flies from City A to City B. Isn't that the bigger arena where there's problems than the arena if I just went to the xyz airline and said I want to fly on that airline? I don't think so, your honor. I think the department's economic analysis and the regulatory impact assessment sort of goes through all of the benefits that would arise is the rule applying to ticket agents and carriers as well. And so there are still massive benefits that will accrue to consumers where this rule to go into effect and where the state to be lifted. And it's also I also get to the point that Judge Southwick raised, which is what is the real scope of the other side's argument? Counsel for the airlines said it might cause some existing rules to fail. And I just want to be clear on this point. Judge Southwick, if you look at page 15 of the airline reply, it says Section 41712A doesn't authorize legislative rules. And so what does that mean? That means petitioner's interpretation would prevent the department from issuing a rule, for example, requiring airlines to disclose the entire price of airfare to provide appropriate compensation to affected customers for overbooked flights and to ensure that passengers don't suffer from, for example, hours long tarmac delays without access to food, water or even bathrooms or or medical care. So I just want to be clear about this. So you sufficiently conversed with a wide range of this litigation. Is this the first time that the authority to create this kind of regulation has been challenged? But so, Your Honor, I think it has to D.O.T. as to 49 U.S.C., whatever subpart is 11712. So it's the first time I am aware that it's ever been challenged in this sort of broad based way. Does 41712A and the carryout provision grant the department authority versus, for example, the department has exceeded its authority on arbitrary and capricious grounds or something about the authority, not the reasonableness of the decision? Yes, Your Honor. And that's why we've made a forfeiture argument. And that forfeiture argument, Your Honor, is also supported by the text of 49 U.S.C. 46110D, which also includes an exhaustion requirement, which they did not meet here. Isn't that less salient a problem after Loeb or Bright? I mean, whatever the agency thinks of its authority, we wouldn't be bound by it or even be have much weight. And so it's up to us anyway. So I don't know how that plays out. I mean, it also fits into party presentation. Do you need to present an argument before a body that doesn't really have authority to deal with it in order to preserve it for a higher different tribunal that does have authority? I mean, you can make whatever argument you want to about it, but it cuts across a lot of areas of party presentation, I think. Your Honor, I would page 2262 of Loeb or Bright, where it's talking about how there's still a role for Skidmore deference. And so giving the agency the opportunity to address an issue entitled the Skidmore deference, and it also consistent with what Your Honor was talking about, basic preservation principles that, look, if you are going to try to topple an administrative decision, you have to present that issue before the agency to at least give it the opportunity to discuss the issue. So the agency could have, for example, given a greater discussion of its under the two provisions that are at issue here. So I don't think it's irrelevant under Loeb or Bright. I know, Your Honor, that petitioners in this case and others are trying to raise Loeb or Bright as sort of a talisman to wipe regulations off the books without paying particular attention to the statutory delegation, but that's just not the case here. Okay, what if we wanted to send, you know, so even if we felt like they're not necessarily staying by having not said enough to y'all in the first place, what if we thought y'all need to talk? What would you suggest on that? Should we vacate and remand? Should we stay and remand? Should we just remand? What should we do if we think that the airlines should talk with DOT to try to figure this out more, I don't know, intelligently, I don't know if that's the term. So, Your Honor, the agency and the regulated entities have talked and talked and talked about this issue for almost a decade now. There's working groups, there's hearings, there's notice and comment, and what the agency did here after all of that talking and all the support from consumers, the GAO, state attorneys general, was it made very particular findings about what the regulated entities, including carriers, needed to disclose. And so, I know the other side said the agency has not made any findings here, and that's just flatly incorrect. I'd refer the court on the unfair or deceptive piece of it to page 34627, where, quote, the department has concluded that a carrier commits an unfair and deceptive practice when it discloses an airfare in response to a consumer's itinerary search, and this is the critical part, without providing accompanying information on applicable fees for baggage. And there's similar findings two pages later and then one page after that on 34630 on all the critical ancillary services here. And so, the key point that I want to get across, the disclosures need to be up front because the fare cannot exist in a vacuum without the other information. Otherwise, it's misleading, and that's what the department found here. The department... Can you walk me through... So, let's say I want to go to New Orleans next Monday. I'm right now in Dallas, okay? So, let's say I want to do that, and I go to an airline that flies out of Dallas, okay? What is it... Because I'm looking first for a time and a this and a that, maybe the different levels of payment, you know, and so on. And that's what I'm looking at first, and then I would want to know about my check bag and so on and so forth. So, how... If I'm looking at a... Let's say that it's an airline that flies 10 times to New Orleans a day, okay? Wouldn't I want to go through that first and click on, okay, I'll go at 6 p.m. before I learn anything else? So, first, Sharon, I think there's a distinction here between whether that gets to the issue of statutory authority. And so, I will just assume for a moment that the department has statutory authority to promulgate this type of rule, and this is instead going to whether the rule itself is arbitrary and capricious. And I think what your honor is getting at is that the core issue of, look, agency, are you being reasonable, or is this just going to be too cluttered? Is there just going to be too much information? And this... On this issue, this is an issue of agency success. This is reasoned decision making, but it's paramount. And the reason is the agency listened to concerns by industry, by the carriers, and modified the proposal. And so, I just refer the court to page 34650 of the preamble, where the agency said, look, we're going to change from the proposal and said we're going to allow pop-up texts. We're going to allow expandable text. We're not going to allow hyperlinks because that's going to take you to a different site and that's going to be overly burdensome. And here is the critical finding by the agency. Quote, the department concludes that these modifications from the proposal will better enable industry to use innovative web design to display fees in a matter that is technologically feasible while still ensuring that consumers are provided with critical information about the true cost of travel at the time of the itinerary search. So, this is of the agency actually listening to industry and we're going to modify from our initial proposal. And so, it's not all that different from the expandable text and pop-ups you use now, but you use them later in the process. And so, to prevent drip pricing, we're going to bring that up closer. We're going to say you have to do it up front because it's that need. Okay, but in my example, if you were hired to go and do airline x and show them what to do, what would you have them do on what I'm talking about? I'm looking at a bunch of flights to another city and I want to find that the right time and so on first. What's your view of that? So, what the agency determined was that the cost of doing that is too great because it separates that initial fare from the actual hidden fee that occurs down the line. So, what it's requiring is for that full fare, including fees for critical ancillary services to be brought up and displayed not necessarily on the first click, but the first time that the fare and schedule is provided in an itinerary. So, your friends on the other side use the hypothetical of pick your favorite fast food place and this is no different from the entree versus the combo meal price. How do you respond to that? Sure. When I drive up to a drive-through window, the combo price is displayed right away at the first moment. And so, if that were the case, the agency would be fine with that, but it's not. And I should also note, Judge South was talking about the problem of drip pricing. We talked about it extensively in our brief and there was not a word about it in the replies. So, I do think that that is an uncontested point. This is discussed in the regulatory impact analysis on page three where it's overly burdensome for consumers to start down the process and then to find the fees at the very end where they might not be likely to switch and go to another website because of sunk costs. And I'd also like to make one correction. And so, it's very different from Judge Douglas's fast food model. It is not the case that all of the fees are provided even before purchase. The rule at page 34.629 is talking about how sometimes changing cancellation fees are not provided until after purchase. And so, we're not- What fees were those, sir? 34.629. But what fees did you say? Is that right? I just didn't hear the word. I'm not asking for anything more than you repeating yourself. Right. The change in cancellation fees. Oh, cancellation fees. Okay. Yes, sir. And this is addressed on pages 64 and 65 of our brief. Well, counsel, to the extent there's evidence necessary, needs to be evidence that there's really a problem here. On page 34.624, a particular reason for you to look at it because I'll read it, offers aviation consumer protection received over 500 complaints regarding change in cancellation fees, certain number of complaints regarding other things. And I don't see right now complaints regarding baggage fees, but that's in there somewhere. What that doesn't break down is how many are just complaining, I don't want to be charged these fees, the fees are too high, whatever. It's not necessarily a complaint that we weren't told soon enough before I purchased, we purchased tickets that these fees exist. I mean, that does seem to me central because that's what your regulation is allegedly fixing. It's actually addressing, but allegedly fixing. Um, is there any better evidence of how many are actually complaining that we learned too late, their prices were dripped and whatever else, uh, before we learned about baggage fees? Yes, sir. And I think later on in that page, it also talks about how the department itself continues to receive hundreds of consumer complaints each year. It explains that the number of fees to the actual department is just a fraction because for example, planning about a late flight, I'm usually not sending my complaint to the department of transportation. There's a reference in the preamble to how state attorneys generals even complaints every single day about drip pricing, hidden fees and things like that. And so this is a, this is a very real problem in need of a modest, but important solution, which is what I think the department did here. Well, counsel, you've used modest a few times, maybe even in your opening sentence, I would have to go back and see. And I do wonder about that. I mentioned to one of the counsel on the other side, the amicus brief from a brief of airline tariff publishing. And it makes it sound like parade of horribles that has been imposed on these airlines, uh, by its, by its obligations. And then there were pictures of what a screen would look like, not necessarily in that brief, but somewhere in the record. And I must say, uh, where's the problem looking for a solution, a disease looking for a cure. Uh, it does seem to me that there's a serious question here of whether you were making things better or worse and whether the problem was that serious in the first place. Now your client has very much first cut at this, not a statutory interpretation, but at, uh, what is reasonable and necessary, what the problems are, whatever else. Um, but I do, I will be taking a serious look at whether you, this has been justified both on the problem size and whether it's a Yes, your honor, uh, judge, I don't say this lightly. I think that amicus brief could have been written after the proposal, but before the final rule, because I don't think it adequately takes into account all of the meaningful changes the agency made in response to complaints by industry. And I would just again, refer to the discussion on three, four, six, five, oh, where the agency explains, uh, why the, uh, what it, what it did. It said, look, you have to give all this, you have to provide all this information up front has to be accurate. It has to be clear and conspicuous, uh, but otherwise carriers, ticket agents, we're giving you a lot of flexibility in how you do it. You can still use pop-ups, which was something that was requested by, uh, uh, petitioners. You can endable texts. And so I would just refer your honor to, to the particular page in this surrounding discussion about the change, the meaningful changes the agency made in response to, uh, industry itself. Can I ask, uh, so I may have used the wrong term when I said Google, what about Expedia? Is that affected? Isn't that affected? So, so ticket agents are, are covered. And so they are. And, and, and that's an entity that is putting a bunch of different, um, airlines. That's what I was addressing. I should have used a different term from Google to Expedia. But the point is that is what somebody who's trying to get the cheapest flight might go on, right? Yes, your honor. And then that entity is the one that's most likely to have a bunch of la, la, la, la, la, before you get down the road, much more so than going to just one airline. And that's why I'm wondering, why are they not here? Uh, you, your honor, I can't speak for why they are not here. I can't speak for why not a single of the millions of consumers affected are not here. If I had to guess, it's because this is not categorically different from the 2011 rule. It instead is, uh, is bringing those, uh, disclosures up front. And if I had to speculate, I have no idea why the airlines are here, except I would note that the agency concluded, uh, that there would be that consumers are paying petitioners over half a billion dollars a year based on undue hidden fees. Well, I mean, and so I'm right. Expedia is in fact an entity that needs to follow this because it is selling the tickets, right? Yeah, all ticket agencies do. And that's a ticket agency. So again, I'm sorry, I should have used that term, but getting back to the airlines, if they're about to lose a bunch of money, having to shift their, uh, online information, then that's not going to help keep the costs down, which was the whole idea of the deregulation was exactly to create entities such as Spirit, but also take regular entities and make them cheaper. I remember as a little kid that every, people didn't fly on airlines that much because they were so expensive and now people fly on airlines a lot, right? And that's because they're, they brought the price down as a result of the deregulation. And now is that going to bring their pricing up because they have to go through this expensive change? So your honor, I want to be crystal clear. The airline deregulation act of 1978 has nothing to do with this case. The core rulemaking authority existed in 1977 and 1979. I don't understand petitioner's argument that they can just say deregulation happened and that somehow affects sub salientio, the authority, the actual statutory authority that Congress provided. Uh, as to your honor's specific question, all of, all this is doing is requiring basically almost the same disclosures that are currently made, but again, brought up to allow consumers, which I think is also the purpose of deregulation to make clear, transparent decisions, knowing what the actual cost of purchasing their air flights actually are. Um, but I guess I, I, I, I understand the point that was made. What if you're on a little phone, uh, or a small iPad and you're trying to go through and, and, um, get a ticket and there's all of this information and it's kind of hard to find what you're looking for. I mean, what, how, I'm just trying to figure out how this is going to work if we end up affirming. Right. Your honor, again, I would just refer to you. This is a agency success story. This is where the agency actually listened to industry and accepted. I think it, I think it was airlines for America that said we should have pop-ups and that would go a long way toward, uh, decreasing some of the, the potential costs. I'm looking at, let's say that there's 10 flights to where I'm trying to go. It wouldn't necessarily have la la la la la la on each one. I could just, when I click on number the, the second of the 10, that's when it would pop up. So if I understand your honor correctly, all the rule does is that the first time a fare and itinerary is, or a fare and a schedule is provided in an itinerary, not just the basic fee, but these critical ancillary service fees must be provided as well. And then when coupled with allowing expandable text, which is just where it can be on the same page, but you could, you have to, click an arrow or something like that, allowing pop-ups. Basically all the agency is doing, we don't want people navigating away from the website you're on because it takes time. It takes effort. And, you know, after the fifth click, uh, because of drip pricing, you might be less inclined to start the process all over. So all it's doing is requiring disclosure upfront. So then the word stop, why wouldn't you just say we're stopping the hyperlink? Why are you saying, but we're starting X, Y, Z. Your honor, this turns back to the statutory authority. I think this squarely goes into the heartland of the American hospital association case. We're talking about, uh, in our briefs where the Supreme court has clearly said, uh, this is on page 6, 12 of the opinion that even if a statutory scheme requires individualized determinations, the decision maker has authority to, uh, uh, issue a regulation that provides the rules that will apply in those individual adjudications. And so I think this goes back to your honor's question, uh, to opposing counsel, what is being stopped? The agency could have done things two ways here. It could do things efficiently through a rulemaking. And we talk about the, all of the Supreme court cases talking about the virtues of rulemaking in this space, where all interested parties, including all carriers have an opportunity to participate. So that's what we did here. Or it could have been done through individual adjudications and the same disclosure requirements could have popped up on, you know, where not everyone, uh, not all carriers have the ability to, to participate. And so this case is like American hospital association cases like heckler versus Campbell, which is one of the cases cited in American hospital association. They clearly stand for the proposition, uh, that refutes petitioners interpretation of statutory authority. This, if I can get one point across, this is not a case about implied authority. This is not a case about, uh, local rights, somehow vanquishing express statutory authority. This is clear express statutory authority that Congress has given to the department is spent in when coupled against, uh, several Supreme court decisions that say you are allowed to use carry out provisions to set the stage for how individual adjudications, uh, will occur. Yeah. So I looked at the briefing in front of the motions panel for the state. I'm pretty sure American hospital association wasn't raised. Uh, no problem. I'm not talking about waiver on that, but, uh, what was your argument to the motions panel as to why, uh, station up, why this authority existed? Yeah, sure. I think, so I wasn't involved in this case when it began. So I'm not exactly sure about all of the arguments. I didn't mean you, you, I meant the department of transportation. I understood. I understood. I'm just saying based on personal experience and what I know, I'm trying to contextualize, uh, uh, what I knew, uh, or no, uh, the basic argument was that, um, stop doesn't somehow preclude the, uh, department from, uh, any sort of rulemaking in this space. And you can flip any base prohibition into a, an affirmative, uh, statement as well, which I think we also focus on in the brief and the Murphy decision to Supreme court, for example. But again, your honor, I don't think it's a question of forfeiture or anything like that. And I think I'm just thinking, I don't see the American hospital has been widely cited like a lot of Supreme court cases. You didn't sign you department of justice inside it. And the motions panel, most of the panel didn't consider it. I do wonder if it's, uh, it certainly looks like it's broadly applicable to the situation we have in front of us, but that's one reason for the question, just how, how recognized is that as something that answers the question that's before us. That's, that's, that's meditating on it. You don't need to respond to that. Go ahead. I think it goes back to the Supreme court case in the United States versus store. And those types of cases are all talked in, for example, uh, 32 federal practice and procedure 8, 1, 1, 7, where the general principle is agencies have the ability to set rules that quote channel administrative outcomes. And so I don't think it's sort of like a one-off Supreme court case that has never, never been cited. It stands for a very, uh, important principle, uh, that speaks to, uh, agency efficiency as well through rulemaking. Do you have anything else for us, counsel? I, your honors, I would be happy to address any other particular issues. Um, there were, well, we ended up concluding, you know, the number, uh, four of the, um, air airlines group. Um, they said you didn't give them a chance to speak about changes that you made before you issued the rule. And so if we ended up agreeing with that, I'm not saying we will, but if we did, is that a remand or a vacate and remand? Your honor, I don't think vacature would be warranted here, especially on something, uh, like that, that could be easily fixed on remand. I would, I would just note, however, that the RUP survey they're talking about was broadly consistent, uh, with the surveys that, uh, airlines for America did in 2018 and 23, uh, that weren't done, you know, for this litigation. And so those were the surveys that the agency credited, uh, in the regulatory impact analysis. And along the similar lines of evidence cited in the regulatory impact analysis, uh, the petitioners say that the department pulled its consumer estimates, uh, overpayments estimates out of, out of thin air. And I just want to very briefly respond to that. The department estimated that current confusion about ancillary fees raises the cost of airfare by 5%. And the idea there is that individuals would continue to travel, but with better information, they could do searches. And I just want to point out that everyone agreed that 5% was reasonable. That's the number that the department cited, uh, in its initial regulatory impact analysis. That's on pages 18 to 19, uh, discussed in the regulatory impact analysis on final review and page 30. And here, I just want to be clear. It's also the figure that Airlines for America used in its own study, and that's on pages 11 and 12 of attachment B of its January 2023 comment. And that's also probably a very conservative, uh, estimate, uh, as well. I'm happy to ask, to answer any questions the panel has about any issue, including statutory authority, arbitrary breaches, et cetera. Uh, but unless the court has no further questions, we ask that the petitions be denied. All right, counsel. Thank you. We'll hear a rebuttal. Thank you, your honors. Um, let me make an overarching point and then hopefully have a discussion. I do think the state panel here got it right. There's no statutory authority to prescribe by DOT, and this rule prescribes lots of specific requirements. It's not just a rule that broadly prohibits lying or omission. That said, if the panel is looking for a way to issue a narrower decision and promote reasoned decision-making or potentially further discussions, it would be appropriate to vacate and remand, given the failure to support the rule with a cost-benefit analysis, uh, and in order to, in order to permit public comment on the data that DOT now relies on. Uh, we didn't talk about... Let me help you unpack just a bit. One part I want you to unpack. It does seem to me that the range of costs and the range of benefits is, is very uncertain, uh, that the numbers are large and the numbers are, uh, very speculative, it seems to me, which gets back to how serious is the problem and how expensive is it to fix whatever the problem is. What do you say to the numbers on the costs and the benefits? So, for starters, Judge Stafford, what I would say is we didn't have an opportunity to engage with DOT on that. DOT's core justification for this rule was that it was net beneficial for consumers, yet at the NPRM stage, when DOT solicited comments, it said, quote, it was not possible to quantify total benefits or total costs or to quantify whether the proposed rule would yield benefits that exceed costs. That's the 2022 RIA. It was only in the 2024 RIA that they came forward with any costs at all, and so the failure to provide the public with the opportunity to comment on the cost-benefit date analysis that was ultimately DOT's core justification for the rule is itself a basis for vacating and remanding. Now, with respect to what they did rely on in 2024, Mr. Totaro talked about the supposed consumer overpayments and 5%. Even in the 2024 RIA, this is at page 30, DOT said, quote, we do not have any data to judge the accuracy of this assumption, namely the assumptions leading to their overpayment figures. DOT simply has not grappled with the costs and benefits of this rule. It also took action here without establishing that there is a genuine problem to be solved. DOT says here that consumers care more about ancillary fee disclosures, care about ancillary fee disclosures. It never established that consumers care more about those disclosures than they do about clarity and efficiency, and as I quoted in my opening argument, DOT's own analysis recognizes that the rule slows down searches. Even with those assumptions, DOT put the odds in the 2024 RIA that the net benefits are positive at roughly 53%, essentially a coin flip. DOT also failed to adequately substantiate the rule's benefits. Even in the 2024 RIA, they said, quote, we do not have reliable measures for the share of passengers who consider information about ancillary fees when they search for airline tickets. DOT rejected the Campbell Hill survey that the airline submitted, which reflected that only 20% of consumers pay to check bags. It relied instead on a university survey that's not representative, and so DOT's conclusions here do not withstand scrutiny and don't constitute reasoned decision making. If I could briefly, Judge Haines, address your question about ticket agents and third parties. First, this rule will have a significant impact on airlines, including not just the low-cost carriers. We established that at the stay stage with declarations showing the significant costs that this would impose. The rule puts the burden on us, on the airlines, to provide information to ticket agents in a particularly prescribed form, and so ultimately that's why we're here, because the burden falls on us. The ticket agents, if the rule is set aside, they won't get that information. If the rule is upheld, they get information from us. The burden's on us more than it is on them to comply. Counsel, there's some deadlines under the rule. Obviously, a stay's been entered. Let's say we rule in favor of the government, heaven forbid, but what does that do to the deadlines, or what should we say as to them? If you were, unfortunately, to do that, initial deadlines were set at six months out for certain requirements and 12 months out for other requirements from the rule's issuance, and so we would ask at least that those timeframes be reset from the time of any adverse decision. So, the calendar would be six months, 12 months from whenever our ruling would be, would be your suggestion? Well, I think, not to prejudge what would happen here, but I think we would ask for a further stay so that we could further review in that situation. But we need to have a complete addressing of whatever the resolution of this case requires, and I'm just wondering about the deadlines. Is it also the position, not just of the low-cost carriers, but of the larger carriers, or at least those who charge more? This really is quite expensive for you to adjust your computer programs or whatever it be. I mean, we're talking about hundreds of millions of dollars to respond to what DOT has come up with. It is. This requires fundamentally redesigning both websites and apps and, again, going to the third party, to the ticket agent point. The burden of providing information in the way that DOT is requiring us to provide to the ticket agents is itself very difficult and expensive. This is all detailed in declarations at the stay stage. One carrier, Hawaiian Airlines, even indicated in its declaration at the stay stage that it would have to cease doing business with certain ticket agents because of incompatibility with the systems that would be required to transmit the information that DOT is requiring. So, this is a very significant... You're saying it's a bigger problem for the airlines than for something like Expedia. If you get up to speed with what's supposed to happen, these commercial, non-airline-specific agents will just get that information and be able to display it? Is that sort of how that would work? I can't speak specifically for the burden on them. I think there would probably be a website redesign burden on them as well, but it would be a much lesser burden than on us because we're the ones charged with conveying information to them in a particular form, and that itself is an expensive enterprise. Again, all of this is set out in the declarations from the stay stage. Well, your panel is all self-interested in this. Nobody's asked us to be accused, but we all fly. So, I'm glad you appreciate it. If anybody has to be accused, nobody has to be accused. Isn't that the rule? So, anyway. I don't think we could find three judges who don't fly. Well, there was one judge I think who doesn't fly, but I won't identify. We're all nodding our head as to who that would be. Nonetheless, I appreciate your assistance to us on this. And Crowell has two minutes, right? Yes. I'm sorry. I actually don't have a cheat I said earlier. So, I'm handicapped. Go ahead, Mr. Crowell. Thank you, Your Honor. I want to first address a couple of the questions raised to my friend on the other side. It was mentioned that is this a problem in search of a solution? And I want to emphasize that during the 2019 to 2021 time frame, there were 665 complaints about bag fees generally, and that is with over 1.75 billion passengers flying during that same period of time. We're talking about four millionths of a percentage, 0.00004% of complaints from flyers. So, was that complaints to government as opposed to the airline? Yes, although the airlines do report their complaints to the department. Was that part of the data that you can refer us to? Because it does seem to me more likely to complain to the airline. Yes. So, the number of complaints to DOT is in the record. We don't have, I think Spirit had two complaints in 2023 we have in the record. We haven't looked specifically at all the years. But it is, you know, it is a minuscule number. Another question by or statement, sorry, by my friend on the other side said that not all fees are provided before purchase. Your Honor, that is part of the 2011 rule. If you go to the front page of any airline website, including Spirit's, you will see a link that takes you to a place which shows every fee for bags, every fee for other optional services, change fees, cancellation fees, pets, oversized baggage, anything that the airline charges is in one place. And everybody has access to that page before they go and search for their flight. So, this rule is a problem in search of a solution. And I want to lastly point out one major point that the government has not responded or addressed its authority under section 41504 at all in this case. That is the authority to regulate the publication of price. And that is how it did so prior to deregulation in domestic air transportation. After deregulation, Congress limited that authority to foreign air transportation only. And they have not responded to this at all. All right, counsel, we'll deal with all of this. And we take the case under advisement. Thanks to all. Thank you, Your Honor. Thank you.